**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 5, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

ELIAS LUCAS GALLEGOS,

     Defendant - Appellant.

No. 23-2010

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:21-CR-01496-KWR-1)**
_____

J.K. Theodosia Johnson, Assistant Federal Public Defender (Esperanza S. Lujan, Assistant Federal Public Defender, with her on the briefs), Albuquerque, New Mexico for Defendant-Appellant.

Emil J. Kiehne, Assistant United States Attorney (Alexander M.M. Uballez, United States Attorney, with him on the brief), Albuquerque, New Mexico for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Judge, **McHUGH**, and **EID**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

_____

Defendant-Appellant Elias Gallegos appeals from his conviction for assaulting a federal officer with a dangerous weapon. He raises two issues on appeal. First, he argues that the district court erred in admitting the identification testimony of the

victim because that testimony's reliability was outweighed by the corrupting influence of the show-up identification procedure used by the Albuquerque Police Department ("APD") officers.  Second, he contends that the district court abused its discretion in admitting evidence of his flight in the aftermath of the assault.

Mr. Gallegos's arguments are unpersuasive on both fronts.  Despite the undisputedly corrupting influence of the show-up identification, the victim's eyewitness testimony displayed sufficient indicia of reliability to warrant admission.  Further, the record amply supports the reasonableness of the district court's admission of evidence of Mr. Gallegos's flight.  Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** Mr. Gallegos's conviction.

## I

## A

### 1

In the early afternoon on September 17, 2021, Luis Quiroga—a mail carrier for the U.S. Postal Service—was delivering mail on foot in a residential neighborhood of Albuquerque, New Mexico.  It was a hot, sunny day, with the temperature above eighty degrees Fahrenheit.  As Mr. Quiroga walked along Constitution Avenue, he noticed a man about thirty feet ahead, walking on the sidewalk in the same direction.  Mr. Quiroga noticed the man because he was not walking in a straight line, as if he were under the influence of some sort of intoxicating substance.  The two continued to walk apace and with the same distance between them for the next ten minutes or so, as Mr. Quiroga delivered mail along his route.  Mr. Quiroga did not see the man's

face throughout this period but did observe his clothes—a yellow sweater and blue jeans.

The man then crossed into the middle of the street and knelt down to apparently pick something up. As he did so, Mr. Quiroga began to cross the street as well, to deliver mail on the other side. Suddenly, the man stood up and turned to face Mr. Quiroga, holding a two-to-three-inch knife in his hand; the man appeared to be startled. The man told Mr. Quiroga to "turn around." R., Vol. I, at 269 (Tr. Suppression Hr'g, dated Sept. 1, 2022).

During this interaction, the two men were roughly twenty feet apart, and Mr. Quiroga had a "brief," "good view" of the man's face for about five to ten seconds, but his focus then "went to the knife." *Id.* at 270, 272, 292. And once he saw the man brandish the knife, Mr. Quiroga felt himself to be "in danger." *Id.* at 270.

Complying with the man's order to "turn around," Mr. Quiroga changed directions and "walked away quickly." *Id.* at 269–70. Looking back, he saw that the man was "running towards [him] with the knife." *Id.* at 270–71. Mr. Quiroga then fled down another street "as fast as [he] could" before turning back again to see if the man was still following him. *Id.* at 290. In fact, the man had stopped running, and the two were roughly forty feet apart. After Mr. Quiroga turned around, the man picked up a baseball-size rock and threw it at Mr. Quiroga, who dodged it to avoid being struck. The man did not continue to pursue Mr. Quiroga, and Mr. Quiroga did not see where the man went after throwing the rock.

**2**

Mr. Quiroga returned to his delivery truck and, at 12:56 p.m., called 911 to report the encounter. He described his attacker to the dispatcher as a Hispanic man with dark hair, about 5'9" tall, weighing roughly 170–180 pounds, who appeared to be in his mid-20s or early 30s, and wearing a "yellow sweater [and] baggy blue jeans." *Id.* at 273; *see also* Aplee.'s Suppl. R., Vol. II, Ex. 1 (Recording of 911 Call, dated Sept. 17, 2021).

Emergency dispatchers relayed Mr. Quiroga's report of the attack and his description of the assailant to APD Sergeant Richard Whitten, who was on patrol in the area and driving a marked police car. At approximately 1:08 p.m., Sergeant Whitten saw a man in a yellow sweater and blue jeans roughly a half mile from the scene of the attack. The sweater in particular stood out to Sergeant Whitten, given the heat of the day. Sergeant Whitten radioed for backup and continued to observe the man while waiting for other officers to arrive. As the other officers arrived, the man turned into an alley. The officers activated the lights and sirens in their respective patrol cars but, before they could order him to halt, the man began to run away.

With the officers in pursuit, the man ran through the alley and several residential backyards as he made "abrupt turns," seemingly to evade the officers. R., Vol. I, at 228. The chase ended when the man ran into the backyard of a home and entered an unlocked shed. Four APD officers—including Sergeant Whitten—surrounded the shed, and Sergeant Whitten informed the man that he was being

detained and ordered him to come out.  The man emerged from the shed, but walked toward the house, rather than surrendering.  He was now shirtless and still wearing blue jeans.

As the man approached the backdoor of the house, Sergeant Whitten—concerned that the man intended to break in to the house while still armed with a knife—shot him in the upper back with a non-lethal sponge round, stopping his progress.  Sergeant Whitten then engaged with the man and encouraged him to surrender peacefully, which he did after roughly 20 minutes.  The man identified himself as "Yoshi" and claimed that he lived at the house, but the homeowner confirmed that the man did not live there and did not have permission to be on the property.  *Id.* at 231–32.  Later, the man was identified as Elias Gallegos.[1]  A search of the shed revealed a knife that the homeowner confirmed did not belong to him.

Meanwhile, during the pursuit and arrest of Mr. Gallegos, another APD officer arrived at Mr. Quiroga's location at approximately 1:20 p.m., and Mr. Quiroga repeated his description of the assailant—describing him as "wearing a yellow sweater, really baggy blue pants, . . . I think Hispanic."  Aplee.'s Suppl. R., Vol. II, Ex. 2, at 3:03–3:19 (Lapel Camera Video, dated Sept. 17, 2021).  He also noted this time that the man had curly, dark hair "kind of like a[n] [A]fro" and was not heavy-set.  *Id.* at 3:21–3:23.

---

[1]     The record does not indicate exactly when Mr. Gallegos was identified by his legal name.

**3**

After Mr. Gallegos was arrested, at around 2:00 p.m., an APD officer approached Mr. Quiroga, informed him that a suspect who matched Mr. Quiroga's description was in custody, and drove Mr. Quiroga to the scene of Mr. Gallegos's arrest. The officer also told Mr. Quiroga that the suspect appeared to be homeless and under the influence of drugs. When they arrived at the scene, Mr. Quiroga stayed in the patrol car—at least 30 feet from where Mr. Gallegos was standing. Mr. Gallegos was shirtless, in handcuffs, and surrounded by police officers. When asked by an officer if he was "a hundred percent sure" the man in handcuffs was his assailant, Mr. Quiroga affirmed that he was. R., Vol. I, at 294–95.

**B**

On October 14, 2021, a federal grand jury indicted Mr. Gallegos for assault of a federal officer with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 111(a) and (b).

**1**

Before trial, Mr. Gallegos moved to suppress evidence of Mr. Quiroga's identification of him, arguing that it was unreliable and inadmissible under the Due Process Clause of the Fifth Amendment.[2] Specifically, he maintained that the show-up procedure that the APD used was "so suggestive that it irreparably damaged the

---

[2]    In the same motion, Mr. Gallegos also argued that APD lacked reasonable suspicion to stop him and that the officers unlawfully seized him by striking him with the sponge bullet. Those issues are not before us on appeal.

reliability of any subsequent identification made by [Mr. Quiroga]." *Id.* at 67 (Def.'s Opposed Mot. to Suppress Evid. and Identification, filed Aug. 2, 2022). The government opposed Mr. Gallegos's motion but conceded that the show-up procedure was unduly suggestive.

On September 1, 2022, the district court held a hearing on Mr. Gallegos's motion to suppress, at which Mr. Quiroga, Sergeant Whitten, and several other witnesses testified. Mr. Quiroga described the assault, his description of the assailant to the 911 operator and investigators, and his identification of Mr. Gallegos. Notably, Mr. Quiroga had difficulty identifying Mr. Gallegos in court at the hearing; he explained that Mr. Gallegos's appearance that day was "very different" because—at the time of the assault—Mr. Gallegos's skin was "a little darker" and his hair was longer. *Id.* at 296–97. As such, Mr. Quiroga was "[n]ot a hundred percent sure" that, sitting in the courtroom, Mr. Gallegos was the same individual who attacked him. *Id.* at 296.

The district court denied Mr. Gallegos's motion. It agreed that the show-up procedure was "unnecessarily suggestive." *Id.* at 330 (Mem. Op. and Order, filed Sep. 19, 2022). Nevertheless, it noted that evidence stemming from the identification could be admitted because "an identification procured through unnecessarily suggestive means is still admissible if it is sufficiently reliable." *Id.* at 329. Proceeding from that premise, the district court applied the factors that the Supreme Court identified in *Neil v. Biggers*, 409 U.S. 188 (1972); these factors address the admissibility of identification evidence procured by unnecessarily suggestive

methods.[3]  It concluded that "the identification was not so unreliable as to create a 'substantial likelihood of irreparable misidentification,'" and thus was not subject to suppression and could be admitted into evidence.  *Id.* at 330 (quoting *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000)).

First, it determined that Mr. Quiroga "had [the] opportunity to view [Mr. Gallegos] with a high degree of attention," as he observed the man's erratic behavior for ten minutes prior to the assault before "fac[ing] Mr. Gallegos in broad daylight about 20 or 30 feet away."  *Id.*  Mr. Quiroga also had a sufficient opportunity to view Mr. Gallegos's face for five-to-ten seconds during the assault and "had a clear view of Mr. Gallegos" after looking back to see if his assailant was following him.  *Id.* Thus, in the district court's view, the first and second *Biggers* factors supported the reliability of the identification.

Third, the district court found that Mr. Quiroga "remained consistent and accurate about his description of Mr. Gallegos" across his encounters with law enforcement on the afternoon of the assault.  *Id.* at 331.  He repeatedly described his assailant as a slender Hispanic man, roughly 5'9" tall, weighing about 180 pounds, and wearing a yellow sweater with baggy blue pants.  Fourth, as the court noted,

---

[3]     As discussed in greater detail *infra*, the Supreme Court in *Biggers* identified five factors that should inform courts' examinations of the reliability of eyewitness-identification evidence obtained under unnecessarily suggestive circumstances: (1) the witness's opportunity to view the defendant at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of any prior description given by the witness, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the identification. *See* 409 U.S. at 199–200.

when Mr. Quiroga observed Mr. Gallegos during the show-up procedure, he immediately affirmed that he was "a hundred percent" certain that the man in custody had attacked him. *Id.* Furthermore, the district court was not dissuaded by Mr. Quiroga's difficulty in identifying Mr. Gallegos during the suppression hearing because, based on the court's own review of an APD officer's lapel-camera recording, it determined that Mr. Gallegos in fact had "longer hair and darker skin the day of the alleged incident"—as Mr. Quiroga stated at the hearing. *Id.* Finally, the district court found that the "short" amount of time between the attack and the show-up procedure—roughly one hour—also demonstrated the reliability of Mr. Quiroga's identification. *Id.*

Therefore, "[a]fter weighing the *Biggers* factors and the corruptive weight of the suggestive procedures," the district court found that, "under the totality of the circumstances, [Mr. Quiroga's] identification of Mr. Gallegos [was] sufficiently reliable to be admitted at trial despite the suggestiveness of the identification procedures" that the APD officers employed. *Id.* at 332.

**2**

Simultaneous to contesting the reliability of Mr. Quiroga's eyewitness testimony, the parties also litigated the potential admission of evidence of Mr. Gallegos's flight from law enforcement. This litigation played out across three separate motions. First, the government filed a motion in limine asking the district court to admit at trial evidence of Mr. Gallegos's flight. It maintained that it intended to use the evidence "to establish consciousness of guilt" because Mr.

Gallegos's flight was "inextricably intertwined with the events of the defendant's escape and apprehension." *Id.* at 72 (United States' Opposed Mot. Lim. to Admit at Trial Evid. of Def.'s Flight, filed Aug. 2, 2022). Second, the government filed a motion in limine seeking admission of excerpted footage from Sergeant Whitten's lapel camera, arguing that it also served to establish Mr. Gallegos's guilt. Third, Mr. Gallegos filed a motion in limine to exclude testimony from law enforcement related to his flight and arrest, arguing that evidence of his flight would be irrelevant and unduly prejudicial.

The district court ruled in the government's favor on all three motions. Though it ruled on each individual motion, generally speaking, the court determined that the evidence of Mr. Gallegos's flight was admissible because it went "directly to context, res gestae, state of mind, and identification, and [was] more probative than prejudicial." R., Vol. III, at 244 (Tr. Pre-Trial Conference, dated Oct. 17, 2022).

### 3

After a two-day trial, the jury found Mr. Gallegos guilty of assaulting a federal officer with a dangerous weapon. The district court subsequently sentenced Mr. Gallegos to fifty-seven months' imprisonment.

### II

Mr. Gallegos timely filed this appeal and raises two separate challenges to his conviction. First, he argues that the district court erred in concluding that the reliability of Mr. Quiroga's eyewitness testimony outweighed the corrupting influence of the show-

up identification.  Second, he asserts that the district court abused its discretion in admitting evidence of his post-assault flight.

Neither argument is convincing, and we decline to disturb the district court's rulings.

## A

Before considering the merits of Mr. Gallegos's challenge to the district court's admission of the eyewitness-identification evidence, we first address the government's position that Mr. Gallegos is foreclosed from making this argument on appeal. Specifically, the government asserts that Mr. Gallegos's decision not to pursue a theory of mistaken identity at trial constitutes a judicial admission that he was the person who in fact assaulted Mr. Quiroga—thereby preventing him from appealing from the district court's order admitting Mr. Quiroga's eyewitness evidence.[4]

We are not persuaded.  The government cannot satisfy the high standard for demonstrating a judicial admission because there is no indication that Mr. Gallegos intended to expressly stipulate to his identification as the perpetrator and, relatedly, that he intended to relieve the government from its burden of proof on this point.  In our view, to hold otherwise would unduly expand the doctrine of judicial admissions and prevent

---

[4]    In its briefing, the government does not explicitly use the term "judicial admission" or expressly invoke the judicial-admission rubric.  However, during oral argument, the government asserted that the substance of its challenge to our consideration of Mr. Gallegos's eyewitness-identification argument falls within the judicial-admission framework, and it maintained that Mr. Gallegos's eyewitness-identification argument should not be considered when that judicial-admission framework is applied to these facts.

parties from adapting their theories of the case in response to adverse pre-trial rulings—such as the district court's ruling to allow the admission of Mr. Quiroga's eyewitness testimony. We decline to bring about that result here. Consequently, we conclude that Mr. Gallegos is permitted to challenge on appeal the district court's admission of the identification evidence.

**1**

A judicial admission is an "express waiver made . . . by the party or his attorney conceding for the purposes of the trial the truth of some alleged fact." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (quoting 9 J. Wigmore, EVIDENCE § 2588 (J. Chadbourn rev. 1981)). Such admissions "include 'formal concessions in the pleadings' and 'are not evidence at all but rather have the effect of withdrawing a fact from contention.'" *Wells Fargo Bank, N.A. v. Mesh Suture, Inc.*, 31 F.4th 1300, 1313 (10th Cir. 2022) (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995)). "Judicial admissions are not just any statements made before the court," but rather "formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." *United States v. E.F.*, 920 F.3d 682, 688 (10th Cir. 2019) (quoting *U.S. Energy Corp. v. Nukem, Inc.*, 400 F.3d 822, 833 n.4 (10th Cir. 2005)). As such, judicial admissions "have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Wells Fargo*, 31 F.4th at 1313 (quoting 2 Robert P. Mosteller et al., MCCORMICK ON EVIDENCE § 254 (8th ed. 2020)).

"Judicial admissions more appropriately refer to 'admissions in the pleadings' that 'are binding on the parties.'" *E.F.*, 920 F.3d at 688 (quoting *Mo. Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1315 (8th Cir. 1990)). In other words, judicial admissions typically appear in pleadings, rather than statements made in open court—unless those statements clearly express the party's decision to formally cede the issue. *See id.*; *see also Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476 (5th Cir. 2001) ("A statement made by counsel during the course of trial may be considered a judicial admission if it was made intentionally as a waiver, releasing the opponent from proof of fact.").

### 2

At trial, through his counsel, Mr. Gallegos did not pursue a defense of mistaken identity. Instead, during her opening statement, defense counsel told the jury that Mr. Gallegos was the man walking in front of Mr. Quiroga and that he did indeed hold a knife when he turned to face Mr. Quiroga on Constitution Avenue. But she explained that Mr. Gallegos brandished the knife as "a gut-level reaction" after being startled by a stranger and did not intend to harm Mr. Quiroga. R., Vol. III, at 29 (Trial Tr., dated Oct. 24–25, 2022). Therefore, according to defense counsel, Mr. Gallegos "acted out of fear and impulse to a startling moment that was unexpected to both of them." *Id.* at 31. She repeated that theory during summation and emphasized that, according to Mr. Quiroga's own testimony, the two men were at least twenty-five feet apart when Mr. Gallegos held the knife—too far for Mr. Gallegos to harm Mr. Quiroga.

13

The government asserts that Mr. Gallegos can no longer contest the admission of evidence related to Mr. Quiroga's identification of him because, at trial, he ceded that issue through a judicial admission.  Specifically, the government contends that, when defense counsel told the jury that Mr. Gallegos was "startled" by Mr. Quiroga but did not intend to harm him, *id.* at 29–31, "[Mr.] Gallegos admitted that he was the person who interacted with [Mr.] Quiroga, thereby demonstrating that [Mr.] Quiroga's identification was reliable," Aplee.'s Resp. Br. at 16.  According to the government, "[t]hose statements were binding on [Mr.] Gallegos, and constitute an admission that [Mr.] Quiroga correctly identified [Mr.] Gallegos."  *Id.* at 17.  And "[b]ecause [Mr.] Gallegos has admitted that no misidentification occurred in this case, there was no constitutional violation"—meaning that we can affirm the district court's admission of the identification evidence without reaching the merits of that decision.  *Id.* at 19.

However, Mr. Gallegos's strategic decision at trial to advance a defense that acknowledged—rather than contested—Mr. Quiroga's identification testimony does not clear the high bar for a judicial admission.  The standard for making a judicial admission is demanding: to determine that a statement qualifies, a court must find that it is an "express waiver made . . . by the party or his attorney conceding for the purposes of the trial the truth of some alleged fact."  *Knowles*, 568 U.S. at 592 (quoting 9 Wigmore, *supra*, § 2588).  Further, judicial admissions trigger a significant consequence—"dispensing wholly with the need for proof of the fact."  *Wells Fargo*, 31 F.4th at 1313 (quoting 2 Mosteller, *supra*, § 254).  Given this high bar, we cannot conclude that there was a judicial admission without determining that

14

defense counsel's acknowledgement that Mr. Gallegos was the person who interacted with Mr. Quiroga constituted a "formal" and "deliberate" decision to concede the question of identification. *E.F.*, 920 F.3d at 688 (quoting *Nukem*, 400 F.3d at 833 n.4). Several factors weigh against such a determination here.

To start, the record does not indicate that the parties and the district court operated under the assumption that Mr. Gallegos deliberately "withdr[ew] [the] fact [of his identity] from contention" at trial. *Wells Fargo*, 31 F.4th at 1313 (quoting *Keller*, 58 F.3d at 1198 n.8). The government questioned Mr. Quiroga in detail about his identification of Mr. Gallegos after the assault and asked him to identify Mr. Gallegos in court as his assailant. And, after closing arguments, the district court instructed the jury that "[t]he [g]overnment must prove beyond a reasonable doubt that . . . it was Mr. Gallegos who committed [the charged offense]. Thus, the identification of the defendant as the person who committed the offense charged is a necessary and important part of the [g]overnment's case." R., Vol. III, at 195.

The government did not object to this jury instruction or note concern that it could confuse the jury in light of Mr. Gallegos's ostensible judicial admission. Yet, when we have determined that defendants have unambiguously and formally stipulated to the existence of key facts—producing, in effect, a judicial admission— the resulting outcome has been that the government need not offer evidence as to those facts; indeed, the relevant element is removed from the jury's consideration. *See United States v. Mason*, 85 F.3d 471, 472 (10th Cir. 1996) ("[T]he jury need not

resolve the existence of an element when the parties have stipulated to the facts which establish that element.").

Further, judicial admissions are typically made in pleadings—rather than during opening statements or summations. *See E.F.*, 920 F.3d at 688 ("Judicial admissions more appropriately refer to 'admissions in the pleadings.'" (quoting *Brice*, 919 F.2d at 1315)); *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010) ("A judicial admission is a statement, normally [made] in a pleading."); *see generally* 2 Mosteller, *supra*, § 254 (clarifying that judicial admissions are "formal concessions in the pleadings in the case or stipulations by a party or counsel").

In this regard, the logic of the Seventh Circuit in *Robinson* is instructive. There, the plaintiff argued that defense counsel made a judicial admission at closing argument by telling the jury that the defendants were not blaming the plaintiff for her own injuries. *See* 615 F.3d at 872. The Seventh Circuit rejected the plaintiff's claim that defense counsel's statement constituted a judicial admission "that the plaintiff had not been contributorily negligent," because if such a position were accepted, "statements made by lawyers in opening and closing arguments, in making objections, at side bars, and in questioning witnesses would be treated as pleadings and searched for remarks that might be construed as admissions though neither intended nor understood as such." *Id.*

The concerns identified by the Seventh Circuit are well-founded, particularly in this context: holding that defense counsel's assertions to the jury constituted a

judicial admission would establish a rule that defendants cannot challenge unfavorable pre-trial rulings on appeal if their defense theory incorporates (e.g., tacitly assumes for trial purposes) the results of those adverse pre-trial rulings.  This would have a chilling effect on the zealous advocacy expected of defense counsel and risk imposing unrealistic constraints on their ability to vigorously argue on their clients' behalf.[5]  Though defendants can judicially admit facts in response to adverse pre-trial rulings, we decline to determine that Mr. Gallegos did so here.

Finally, the government does not cite any apposite cases in support of its position.  It first points to *United States v. Ventura-Perez*, 666 F.3d 670 (10th Cir. 2012), where we examined defense counsel's acknowledgement at sentencing that a state-court document contained a specific fact.  We upheld the district court's reliance on defense counsel's assertion, finding that "the document itself need not be produced in court if defense counsel stipulates to its contents."  *Id.* at 676.  An unambiguous stipulation to a fact at sentencing—upon which the district court immediately relied—is a different factual posture than that before us.  In our view, *Ventura-Perez* is inapposite.

---

[5]    We do not understand this reasoning to be in tension with the Supreme Court's holding in *Ohler v. United States*, where it held that a party that "preemptively introduces evidence . . . on direct examination may not on appeal claim that the admission of such evidence was error."  529 U.S. 753, 760 (2000). *Ohler* addresses a party's affirmative introduction of evidence, not a party raising an issue in opening arguments to acknowledge the likely introduction of evidence by the opposing party.  *See id.* at 755 ("Generally, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted.").

*United States v. Blood* also does not support the government's argument. *See* 806 F.2d 1218 (4th Cir. 1986). Indeed, in *Blood*, the Fourth Circuit upheld the district court's finding that the government's reference in its opening statement and voir dire to the fund at issue as a "prepaid legal insurance plan" was *not* a judicial admission because that statement was not a "clear and unambiguous admission." *Id.* at 1221. The government elides that holding in its briefing, instead focusing on the Fourth Circuit's recitation of the legal standard: "[A] clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party." Aplee.'s Resp. Br. at 17 (alteration in original) (quoting *Blood*, 806 F.2d at 1221). Like *Ventura-Perez*, *Blood* does not advance the government's position. Indeed, *Blood*'s actual holding would appear to undermine the government's cause.

Mr. Gallegos's incorporation into his defense theory of Mr. Quiroga's expected testimony identifying him as the perpetrator was not a judicial admission because Mr. Gallegos did not formally and unambiguously indicate that he was agreeing to remove the fact of identity from the jury's consideration, and neither the government nor the district court acted under that understanding. To hold otherwise would unduly expand the doctrine of judicial admissions and prevent parties from adapting their case theories to account for adverse pre-trial rulings—such as the district court's ruling here that permitted the government to introduce Mr. Quiroga's eyewitness-identification testimony. We decline to bring about such an outcome.

**B**

**1**

Usually the responsibility for "determining the reliability of the evidence presented at trial" falls to a jury.  *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). But courts will assume that mantle themselves when there is a risk of evidence being "'so extremely unfair that its admission violates fundamental conceptions of justice,'" and this judicial "constraint [is] tied to the Due Process Clause."  *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  "The admission of eyewitness identification evidence raises due process concerns 'only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.'"  *United States v. O'Neil*, 62 F.4th 1281, 1287 (10th Cir. 2023) (quoting *Perry*, 565 U.S. at 238–39).

The Supreme Court has established a two-step test for reviewing a defendant's due process challenge to identification evidence.  *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).  First, courts must determine whether law enforcement officials "use[d] an identification procedure that is both suggestive and unnecessary." *Perry*, 565 U.S. at 238–39.  However, "[u]nnecessary suggestiveness alone does not require exclusion of identification evidence." *O'Neil*, 62 F.4th at 1287.  Instead, "[i]t is the likelihood of misidentification which violates a defendant's right to due process," making "the central question[] whether under the 'totality of the circumstances' the identification was reliable."  *Biggers*, 409 U.S. at 198–99. Reliability is therefore "the linchpin in determining the admissibility of identification

testimony." *Manson*, 432 U.S. at 114.  Courts "must disallow presentation of the evidence at trial," *Perry*, 565 U.S. at 232, only when it creates "a very substantial likelihood of irreparable misidentification," *Manson*, 432 U.S. at 116 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

As such, if a court determines that the identification procedure was unnecessarily suggestive, then it advances to the second step: assessing the reliability of the identification evidence itself.  *See id.* at 114.  That inquiry requires courts to examine the "totality of the circumstances" concerning the identification evidence, including the following five factors that the Supreme Court outlined in *Biggers*: (1) the witness's opportunity to view the defendant at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of any prior description given by the witness, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the identification.  409 U.S. at 199–200.  "[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Perry*, 565 U.S. at 232.  Because we "assess reliability . . . by examining the totality of the circumstances," our review is *not* limited to the *Biggers* factors.  *O'Neil*, 62 F.4th at 1287.  Rather, we use them to frame our analysis; however, we make our final determination as to reliability after undertaking a thorough and holistic review of the context in which the witness identified the defendant.

**2**

Before proceeding to examine the facts before us, we acknowledge that our sibling circuits have raised concerns about eyewitness identifications arising under certain circumstances—several of which are present here.  First, the stress of watching or experiencing a crime can hamper a witness's "ability [to] accurately [] process and recall events."  *Young v. Conway*, 698 F.3d 69, 81 (2d Cir. 2012).[6]  In *Conway*, the Second Circuit comprehensively reviewed social science research on the effects of stress on eyewitness identifications and noted that stress has a substantial negative impact on eyewitness accuracy.  *See id.* (collecting studies examining the effects of stress on eyewitness accuracy); *accord United States v. Greene*, 704 F.3d 298, 308 (4th Cir. 2013) ("Even under the best viewing conditions, high levels of stress can diminish an eyewitness' ability to recall and make an accurate identification." (quoting *New Jersey v. Henderson*, 27 A.3d 872, 904 (N.J. 2011))); *United States v. Stevens*, 935 F.2d 1380, 1392 (3d Cir. 1991) (surveying state and federal cases and noting that "stress has been recognized to distort witnesses' perceptions").

---

[6]    The Second Circuit in *Conway* examined whether the witness's in-court identification had a source independent of an earlier, tainted identification, under the Supreme Court's test in *United States v. Wade*, 388 U.S. 218 (1967).  *See* 698 F.3d at 77.  In other words, the court did not apply the *Biggers* rubric there.  However, the Second Circuit's assessment of the potential frailties of eyewitness identifications—as well as the social science research undergirding its assessment—is not limited to *Wade*'s analytic framework and is relevant to our discussion here under *Biggers*.

The deleterious effect of stress on eyewitness accuracy is no less a concern when a suspect wields a weapon and may even be a bigger problem.  This is due to an entirely understandable impulse.  As the Third Circuit observed in *Stevens*, "[c]ourts have recognized that victims, out of fear, often focus their attention on the perpetrator's weapon, rather than his face."  935 F.2d at 1392 (collecting cases); *accord Greene*, 704 F.3d at 308 ("Weapon focus can 'impair a witness' ability to make a reliable identification and describe what the culprit looks like if the crime is of short duration.'" (quoting *Henderson*, 27 A.3d at 905)); *Conway*, 698 F.3d at 81 ("[I]t is human nature for a person toward whom a [weapon] is being pointed to focus h[is] attention more on the [weapon] than on the face of the person pointing it." (second and fourth alterations in original) (quoting *Raheem v. Kelly*, 257 F.3d 122, 138 (2d Cir. 2001))).

Additionally, as we have recognized, "there will not always be clear correlation between witness confidence and accuracy."  *O'Neil*, 62 F.4th at 1289 n.13; *see also* 2 Wayne R. LaFave et al., CRIMINAL PROCEDURE § 7.4(c) (4th ed.), Westlaw (database updated Dec. 2023) ("The 'level of certainty demonstrated at the confrontation' by the witness . . . is not a valid indicator of the accuracy of the recollection . . . ." (quoting *Manson*, 432 U.S. at 114)).  Our sibling circuits have highlighted this dynamic as well.  *See Greene*, 704 F.3d at 309 n.4 ("While acknowledging that under current law an eyewitness's level of certainty in his identification remains a relevant factor in assessing reliability, many courts question its usefulness in light of considerable research showing that an eyewitness's

confidence and accuracy have little correlation." (collecting cases and empirical studies)); *Conway*, 698 F.3d at 88 (collecting studies demonstrating that eyewitness confidence is not a reliable proxy for accuracy); *cf. United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009) (noting that the "problem with eyewitness testimony is that witnesses who *think* they are identifying the wrongdoer—who are credible because they believe every word they utter on the stand—may be mistaken").

Social science research has confirmed other common intuitions about eyewitness identifications.[7]  For one, the farther away the witness is from the suspect during their interaction, the less reliable the identification will be.  *See* Gary L. Wells et al., *Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later*, 33 L. & HUM. BEHAV. 1, 9–10 (2009) (observing that most people's ability to identify faces begins to decrease at a distance of twenty-five feet); Nat'l Research Council, IDENTIFYING THE CULPRIT: ASSESSING EYEWITNESS IDENTIFICATION 1, 92 (2014) ("The physical distance between the witness and the perpetrator . . . directly affects the ability of the

---

[7]     To be clear, academic research is not controlling in our holding here.  However, we acknowledge and incorporate relevant scholarly work as appropriate in framing our legal analysis and underscoring salient points of that analysis.  This is in keeping with the practice of both the Supreme Court and our own court.  *See, e.g.*, *Indiana v. Edwards*, 554 U.S. 164, 178 (2008) (noting the conclusions of "recent empirical research"); *United States v. Starks*, 34 F.4th 1142, 1165 n.7 (10th Cir. 2022) (collecting studies showing that "statements made in closing arguments . . . are likely to have an outsized effect due to their temporal proximity to jury deliberations").

eyewitness to discern visual details, including features of the perpetrator.").  A similar correlation is at play regarding the duration of the encounter: the briefer the time period of the observation, the less reliable the identification.  *See, e.g.*, Peter N. Shapiro et al., *Meta-Analysis of Facial Identification Studies*, 100 PSYCHOL. BULL. 139, 140, 142 (1986) (conducting a meta-analysis of 128 different studies and finding a direct relationship between viewing time and identification accuracy).  As discussed in greater detail, *infra*, both we and several of our sibling circuits have acknowledged these dynamics when assessing the reliability of eyewitness identifications under the *Biggers* framework.[8]

---

[8]    The Third Circuit has admirably contributed to the accessibility of this academic landscape by convening a task force to study eyewitness identifications, which authored a comprehensive report.  *See* Third Circuit Task Force, *2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications*, 92 TEMP. L. REV. 1 (2019).  That report marshals reams of research and supports the conclusions discussed *infra*.  *See id.* at 20 ("[T]he length of time that a witness has to view an event, known as the 'exposure duration,' can impact the accuracy of the memory.  Exposure of limited duration may also result in 'poorer quality person descriptions.'  In this regard, it is important to note that witness estimates of time are not always accurate because people tend to overestimate the length of brief viewing experiences."); *id.* ("[I]t is not surprising that people can view individuals better at shorter distances than longer ones.  The dominant explanation is 'distance-as-filtering,' wherein faces viewed from longer distances become coarser, with fewer details detectable."); *id.* at 55 ("Without the existence of pristine conditions [to guard against undue suggestion during the identification procedure], a witness's confidence is less indicative of reliability because confidence can be artificially inflated by suggestive procedures.  The critical point is that this relationship between an initial expression of highest confidence and accuracy is obtainable only under pristine conditions."); *id.* at 77 ("The presence of a weapon while witnessing an event can reduce the accuracy of witness recall and subsequent identifications, an effect termed 'weapon focus.'  Weapon focus can potentially impair the witness's memory by directing attention towards the weapon, and therefore away from the perpetrator's appearance."); *id.* at 79 ("There is a general agreement on the damaging effect of stress on memory.").

24

Of course, some of these dynamics are also common sense.[9]  It does not take a social science PhD to understand that a closer distance or a longer period of observation increases the accuracy of a witness's description.  Nor is it a surprise that witnesses are less likely to remember key details about a suspect after experiencing high levels of stress—especially if the suspect used a weapon, leaving the witness to feel that his or her life was endangered.  Common sense and empirical research thus point in the same direction: eyewitness identifications, though powerful forms of evidence and often reliable, are susceptible to external factors that can affect the accuracy of a given identification.  We do not understand these phenomena to undermine the validity of the *Biggers* factors; rather, they inform our analysis under *Biggers*.

## C

Viewing the context and circumstances of the assault as a whole, we conclude that Mr. Quiroga's identification of Mr. Gallegos as the person who assaulted him was sufficiently reliable to warrant admission of his identification testimony.  All five *Biggers* factors weigh—to varying degrees—in favor of reliability, and no other considerations undermine that conclusion.  The totality of the circumstances leaves Mr. Gallegos unable to demonstrate that admitting the identification evidence created

---

[9]    Indeed, at oral argument, the government did not contest several of these premises—including the correlations between identification accuracy and exposure duration and distance, calling them "non-controversial."  Oral Arg. At 26:10–28:35.

"a very substantial likelihood of irreparable misidentification."  *Manson*, 432 U.S. at 116 (quoting *Simmons*, 390 U.S. at 384).

## 1

As an initial matter, the government has conceded here that the show-up identification performed by APD was unnecessarily suggestive, and the district court agreed.  That concession properly reflects the long-standing recognition that show-up identifications ordinarily are impermissibly suggestive.  *See Stovall v. Denno*, 388 U.S. 293, 302 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314 (1987); *see also Archuleta v. Kerby*, 864 F.2d 709, 711 (10th Cir. 1989) (accepting the government's concession that a show-up identification was unduly suggestive); *O'Neil*, 62 F.4th at 1287–88 (same).

Our analysis is thus cabined to determining "whether under the 'totality of the circumstances' the identification was reliable."  *Biggers*, 409 U.S. at 199.  Because this inquiry implicates "[t]he ultimate conclusion of the constitutionality of [the] identification procedure[]," we conduct our review de novo.  *Bredy*, 209 F.3d at 1195 (quoting *Archuleta*, 864 F.2d at 710).  But we examine the district court's underlying factual findings for clear error.  *See O'Neil*, 62 F.4th at 1286.[10]

---

[10]    Before proceeding to challenge the district court's application of the *Biggers* factors, Mr. Gallegos appears to contend that the district court applied the incorrect legal test.  Specifically, he contends that "[t]he district court failed to account for how the showup identification affected the reliability," which, according

**2**

We begin our analysis with the first two *Biggers* factors: specifically, Mr. Quiroga's opportunity to view his assailant and the degree of attention that he devoted to observing the man. We acknowledge that these two factors do not strongly weigh in the government's favor. Nevertheless, our precedent does support a conclusion that they tilt the scales in the government's favor.

**a**

When assessing the first factor—the opportunity that the witness had to view the defendant—we often examine three separate components: (1) the distance between the defendant and the witness, (2) the amount of time that the witness observed the defendant, and (3) the visibility conditions at the scene of the crime. *See O'Neil*, 62 F.4th at 1288; *United States v. Kamahele*, 748 F.3d 984, 1021

---

to Mr. Gallegos, the *Manson* Court required when holding that the reliability of the identification evidence should be weighed against "the corrupting effect of the suggestive identification itself." Aplt.'s Opening Br. at 15–16 (quoting 432 U.S. at 114). He says that the district court treated the potential corrupting influence of the show-up and the reliability of the identification testimony as "two distinct inquiries"—rather than carrying over the corrupting effect of the show-up to the second stage of the analysis: assessing the reliability of Mr. Quiroga's identification. *Id.* at 16.

This argument has no merit. Mr. Gallegos points to no authority in which we have ever required a district court to find that the corrupting influence of the show-up identification puts a thumb on the scale when conducting the reliability inquiry—as he appears to suggest is necessary. Instead, he cites authority that emphasizes only the corrupting influence of show-up procedures, which the district court acknowledged, and the government does not contest. Contrary to Mr. Gallegos's argument here, in our view, the district court identified and applied the appropriate test.

(10th Cir. 2014); *Archuleta*, 864 F.2d at 712.  Our precedent leads us to conclude that Mr. Quiroga had the opportunity to observe Mr. Gallegos with sufficient clarity such that this first factor weighs in favor of the reliability of the identification evidence.

Here, Mr. Quiroga saw his assailant for roughly ten minutes from behind, and he saw his face in three brief glimpses from a distance of twenty to forty feet. Moreover, the entire encounter took place in "broad daylight" during the early afternoon of a sunny day.  R., Vol. I, at 330.  Mr. Gallegos contends that the amount of time that Mr. Quiroga observed his assailant, as well as the distance at which those observations took place, renders the identification evidence unreliable.

That position cannot withstand scrutiny under applicable precedent.  First, both we and the Supreme Court have held that identification testimony—even though based on seconds-long observations—can be reliable.  In *Coleman v. Alabama*, the Supreme Court upheld the trial court's admission of identification testimony stemming from the victim's "real good look" at the assailant taken during the illumination provided by the headlights of a passing car.  399 U.S. 1, 4–6 (1970).[11]

Moreover, our caselaw reinforces the proposition that, in certain cases, seconds-long observations of suspects can lead to reliable identification testimony. In *Archuleta*, we concluded that the identification evidence of one witness was

---

[11]    Because *Coleman* preceded *Manson* and *Biggers*, the Court in *Coleman* did not specifically apply the five factors identified in its later precedents.  But it engaged in an analogous reliability inquiry—examining the reliability of the identification evidence in light of the defendants' claim that the lineup procedure was unduly prejudicial.  *See* 399 U.S. at 3.  Accordingly, *Coleman* provides helpful guidance in our analysis herein.

28

reliable even though he had only "two brief, unobstructed views" of the defendant. 864 F.2d at 712.  We also approvingly cited two different cases in which courts held that identification evidence was reliable despite the witnesses observing the defendants for only seconds, *see id.*—specifically, *O'Brien v. Wainwright*, 738 F.2d 1139, 1141 (11th Cir. 1984) (involving a circumstance where the witness had a "closeup view" of the burglar's face "for a matter of seconds"), and *United States v. Burnette*, 698 F.2d 1038, 1046 (9th Cir. 1983) (noting that the witness had an "unobstructed" view of the robber "at close range" "for approximately twelve seconds").

Further, two different panels of our court also have concluded in unpublished decisions that identifications were reliable despite only a seconds-long observation. *See United States v. Fortune*, 216 F.3d 1088 (tbl.), 2000 WL 703332, at *5 (10th Cir. May 30, 2000) (unpublished) (noting that the witness viewed the defendant for "several seconds at the time of the robbery" and also saw him before the robbery when the defendant entered the store to make a purchase); *United States v. Gonzales*, 246 F.3d 683 (tbl.), 2000 WL 1804562, at *3 (10th Cir. Dec. 8, 2000) (unpublished) (noting that at least one witness observed the defendant "from ten to fifteen seconds" without obstruction and "at close proximity").[12]

---

[12]     We cite unpublished cases for their persuasive value only and do not treat them as binding authority.  *See, e.g.*, *United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022).

Mr. Gallegos emphasizes that the limited amount of time during which Mr. Quiroga observed the face of his assailant was too brief to warrant admission of the identification evidence, but he cites no controlling authority to support his argument. Instead, he urges us to follow *United States v. Concepcion*, where the Second Circuit determined that the witness's observation of the defendant for only five-to-seven seconds cut against the identification's reliability, and *United States v. Rogers*, where the Fifth Circuit ruled that the witness's viewing of the defendant for not "very long"—though an unspecified period—cut against the evidence's reliability. *See* 983 F.2d 369, 379 (2d Cir. 1992); 126 F.3d 655, 658 (5th Cir. 1997). But, in addition to their holdings not being controlling on us, the facts in both *Concepcion* and *Rogers* make the cases distinguishable. Relevant to this *Biggers* factor, the defendants' faces were at least partially covered in each case, leaving the witnesses' observations hamstrung by the inability to fully view the defendants' facial features. *See Concepcion*, 983 F.2d at 379; *Rogers*, 126 F.3d at 658.

Second, the distance at which Mr. Quiroga viewed his assailant is not outside the range of reliability according to our caselaw. In *Archuleta*, we determined that a witness (the same one who viewed the defendant only briefly) had a sufficient opportunity to view the defendant even though he saw the defendant from "thirty to forty feet away." 864 F.2d at 712. We concluded that this distance was not too great because, in part, the witness was able to accurately describe the defendant's "features, build, and clothing"—which Mr. Quiroga also was able to do here. *Id.*; *see Brisco v. Ercole*, 565 F.3d 80, 93 (2d Cir. 2009) (rejecting the contention that the

witness having observed the defendant from somewhere between "fifteen to fifty" feet cut against the reliability of her identification, because such a range was "hardly a great distance").

On the other hand, Mr. Gallegos does not point us to any controlling authority supporting his position that the distance here counsels against reliability. In addition to citing academic literature documenting the relationship between the accuracy of eyewitness identifications and distance, he primarily argues that we should follow the reasoning of the Second Circuit in *United States v. Eltayib*—where that court found that the distance of "35 to 40 feet" between the witness and defendant cut against a finding of reliability. 88 F.3d 157, 167 (2d Cir. 1996). He also contends that we have "recognized the inverse—the closer the distance the better the description" and cites two of our cases—*O'Neil* and *Kamahele*—in which we have found that the short distance between a witness and the suspect bolstered the reliability of the resulting identifications. Aplt.'s Opening Br. at 21; *see O'Neil*, 62 F.4th at 1288 (noting that this factor weighed in favor of reliability because the witnesses viewed the defendant from a distance of a few inches or from the other side of a car, respectively); *Kamahele*, 748 F.3d at 1021 (concluding that this factor weighed in favor of reliability because the witnesses viewed the suspects from under eight feet away). Of course, Mr. Quiroga's identification would have had *even greater indicia of reliability* if he had observed his assailant from a shorter distance—like the witnesses in *O'Neil* and *Kamahele*—but, following *Archuleta*, the distance from which Mr.

Quiroga actually viewed his assailant was not too far for this factor to still militate in favor of a reliability determination.

Furthermore, beyond factoring into the equation the obvious fact that *Eltayib* is only persuasive authority, it is also easily distinguishable. In addition to viewing the defendant across a distance of thirty-five-to-forty feet, the witness's observation took place while he stood on the "deck of a bobbing ship in the middle of the night, nervous, and possibly dazed from falling off a ladder after being hit by flying cargo." *Eltayib*, 88 F.3d at 167. Here, Mr. Quiroga saw the man who assaulted him in broad daylight, on firm land, and without any cognitive impairment.

Finally, the visibility conditions under which Mr. Quiroga observed his assailant support a conclusion of reliability. The attack occurred in the early afternoon on a sunny day, and we have found that a well-lit crime scene bolsters reliability with respect to a witness's opportunity to view the defendant. *See O'Neil*, 62 F.4th at 1288 (observing that the crime scene was "illuminated"); *see also United States v. Natalini*, 42 F. App'x 122, 127 (10th Cir. 2002) (concluding that the first *Biggers* factor was satisfied, in part, because the witness viewed the bank robber defendant directly underneath a sky light). Also, Mr. Quiroga and his assailant were the only two people on Constitution Avenue when his assailant turned around to confront Mr. Quiroga—meaning that Mr. Quiroga's observation was not blocked by crowds or objects between them. An unobstructed view of the defendant supports a conclusion that the witness had sufficient opportunity to make a reliable

identification.  *See United States v. Thody*, 978 F.2d 625, 627 (10th Cir. 1992)

(noting that the witnesses had "unobstructed views of the robbers").

Our precedent thus shows that Mr. Quiroga had a satisfactory opportunity to

view his assailant whom he later identified as Mr. Gallegos: he observed the

assailant's face for enough time, from a suitably close distance, and in broad daylight

with an unobstructed view.

**b**

The second *Biggers* factor—the degree of attention with which Mr. Quiroga

observed his assailant—supports the government's cause as well.  The district court

determined that Mr. Quiroga "had [the] opportunity to view [the assailant] with a

high degree of attention," for two reasons: first, the assailant's erratic behavior drew

Mr. Quiroga's attention for the ten minutes in which they walked apace down the

sidewalk before the attack; and second, Mr. Quiroga observed the assailant face-to-

face (a) during the five-to-ten seconds of the assault, (b) when he looked back to see

if the assailant was following him, and (c) when he dodged the rock thrown by the

assailant.  R., Vol. I, at 330.  Though the court acknowledged Mr. Quiroga's

testimony that, during the actual assault, his "attention was on the knife," the district

court found that was not enough to outweigh the time that Mr. Quiroga had to

observe the assailant both before and after the confrontation, as well as the fact that

Mr. Quiroga saw the assailant's face during the confrontation itself.  *Id.*  None of

these findings are clearly erroneous.

Mr. Gallegos challenges the district court's findings by emphasizing that Mr. Quiroga admitted to fearing for his safety when confronted by the knife-wielding assailant, causing him to focus on the knife for most of the attack.  Thus, Mr. Gallegos contends that Mr. Quiroga's overall stress—and weapon-focus in particular—weigh against a determination that Mr. Quiroga viewed the assailant with a high degree of attention.  As support, Mr. Gallegos cites empirical research, as well as *Conway* and *Stevens*, where the Second and Third Circuits, respectively, each explored the considerable impact that fear, especially when caused by weapon-focus, has on eyewitness memories and identifications.  *See* 698 F.3d at 81; 935 F.2d at 1392.

Our caselaw does not address this exact question at length, but we have indicated that we do not find weapon-focus and (assumed or admitted) stress to undermine a witness's reliability if he or she was closely watching the suspect during the crime and provided accurate details about the suspect's appearance.  In *United States v. Brown*, we acknowledged that the armed carjacking was "no doubt stressful" for the victim but concluded that nevertheless the witness paid close attention to his assailants because his description "contained important and specific information including height and clothing."  200 F.3d 700, 708 (10th Cir. 1999); *see also O'Neil*, 62 F.4th at 1288–89 (concluding that the record did not support the defendant's argument that the witnesses paid the suspect insufficient attention because they were looking "into [his] eyes or the gun," as the evidence showed that "[b]oth witnesses

paid close attention to [the suspect's] appearance" during the encounter) (first alteration in original).

Mr. Gallegos does not cite any controlling authority to support his position— an absence that proves fatal to his challenge on this point. Though *Conway* and *Steven*s are thoughtful and well-reasoned, they do not bind us here. Moreover, they speak to only the general effects of stress on eyewitness identifications. Indeed, the Third Circuit in *Stevens* held on the facts before it that the *Biggers* factors "indicate[d] a reliable basis for the victims' identifications" despite the victims' stress. 935 F.2d at 1392.

Mr. Quiroga's ability to provide a detailed description of the assailant, as well as his focus on the assailant in the ten minutes before the attack, tip this *Biggers* factor for the government. As the district court noted, the assailant's erratic behavior caused Mr. Quiroga to view him with focus for the ten minutes preceding the attack. *See United States v. Wiseman*, 172 F.3d 1196, 1210 (10th Cir. 1999) (upholding the admission of an identification because, in part, several witnesses "noticed [the] defendant before he had shown his weapon and demanded money"), *abrogated on other grounds by Rosemond v. United States*, 572 U.S. 65 (2014). And Mr. Quiroga provided two detailed and accurate descriptions of the man whom he later identified as Mr. Gallegos that included the man's height, ethnicity, weight, clothing, and hairstyle. *See Bredy*, 209 F.3d at 1196 (concluding that the witnesses viewed the suspect with a high degree of attention because they "recall[ed] a number of descriptive details, [including] the clothing the robber was wearing [and] the hair on

35

his neck"). In short, Mr. Quiroga's reaction to the stressful circumstances of the assault did not prevent Mr. Quiroga from observing his assailant with attention and clarity and providing an accurate description to law enforcement officials.[13]

c

As we acknowledged at the outset, under the facts of this case, the first two *Biggers* factors—Mr. Quiroga's opportunity to view his assailant and the degree of attention that he devoted to observing the assailant—do not strongly weigh in the government's favor. But our precedent supports our conclusion that they *do* point in the direction of the reliability of Mr. Quiroga's identification. In this regard, we held that a witness's identification in *Archuleta* was reliable despite the fact that he viewed the suspect from thirty to forty feet away—a distance comparable to or greater than the distance from which Mr. Quiroga observed his assailant. *See* 864 F.2d at 712. Moreover, controlling authority provides even stronger confirmation for our conclusion that Mr. Quiroga's brief glimpses of his assailant's face were a sufficient basis for our conclusion that his identification evidence was reliable. Both we and the Supreme Court have held that seconds-long observations can be reliable. *See Coleman*, 399 U.S. at 4–6; *Archuleta*, 864 F.2d at 712; *see also Fortune*, 2000 WL 703332, at *5; *Gonzales*, 2000 WL 1804562, at *3. Furthermore, Mr. Quiroga

---

[13]    We acknowledge that this analysis merges elements of the second and third *Biggers* factors—the latter being the accuracy of any prior description given by the witness. But, because we examine the totality of the circumstances when determining the reliability of identification evidence, we need not artificially separate the individual factors when they organically overlap in practice.

observed his assailant on a clear, sunny day—and unobstructed visibility reinforces the reliability of his identification.  *See O'Neil*, 62 F.4th at 1288.

In contrast, Mr. Gallegos can marshal no controlling authority to support his position on these two factors.  To be sure, Mr. Gallegos leans heavily on scholarly research in attacking Mr. Quiroga's identification evidence, but he cannot point to any controlling authority demonstrating that the facts here fall beyond the realm of reliability.  In sum, we conclude that the first and second *Biggers* factors militate— admittedly, not strongly—toward a reliability determination.

**3**

The remaining *Biggers* considerations strongly support the district court's decision to allow the admission of Mr. Quiroga's identification evidence—that is, they clearly point to the reliability of that evidence.

Turning to the third factor, Mr. Quiroga gave two accurate descriptions of his assailant in the immediate aftermath of the attack before the unnecessarily suggestive show-up—bolstering the reliability of his identification evidence.[14]  After fleeing the

---

[14]    At some point during the afternoon of the assault, Mr. Quiroga also provided a written statement for several U.S. Postal Inspectors who assisted with the investigation.  He described his assailant as "male Hispanic, appeared to be about 5'9", 180 lb.  Curly dark hair.  Wearing yellow sweater, skinny."  R., Vol. I, at 331. The district court quoted from Mr. Quiroga's written statement that he provided to the Postal Inspectors, but the parties did not include that statement in the appellate record.  And it is not clear from the record when exactly Mr. Quiroga provided this written statement.  Because of the lack of clarity regarding the timing of the statement, we cannot rule out the possibility that Mr. Quiroga made the statement *after* the show-up procedure.  That would raise a plausible concern that the description that Mr. Quiroga provided to the Postal Inspectors was influenced by his observation of the suspect in the show-up procedure.  Though Mr. Gallegos does not

encounter with the assailant whom he later identified as Mr. Gallegos, Mr. Quiroga

called 911 and described his assailant as a Hispanic man with dark hair, about 5'9"

tall, weighing roughly 170–180 pounds, who appeared to be in his mid-20s or

early 30s.  He reported that the man was wearing "a yellow sweater [and] baggy blue

jeans."  R., Vol. I, at 273.  Roughly twenty minutes after the 911 call, Mr. Quiroga

repeated his description of the assailant to an APD officer, describing him as

"wearing a yellow sweater, really baggy blue pants, . . . I think Hispanic."  Aplee.'s

Suppl. R., Vol. II, Ex. 2, at 3:03–3:19.  He also noted this time that the man had

curly, dark hair "kind of like a[n] [A]fro" and was not heavy-set.  *Id.* at 3:21–3:23.

A detailed description like that—which accurately described Mr. Gallegos—

bolsters the reliability of Mr. Quiroga's identification evidence.  *See Manson*,

432 U.S. at 115 (observing that the witness's description of the defendant accurately

included his "race, his height, his build, the color and style of his hair," as well as his

facial features and clothing, all of which demonstrated the reliability of the

identification evidence); *Brown*, 200 F.3d at 708 (noting that the witness's

"description of the assailants contained important and specific information including

height and clothing"); *Bredy*, 209 F.3d at 1196 (concluding that the witnesses

---

raise this concern, it causes us to pause and consider whether this third statement
should appropriately be considered in our analysis of the third *Biggers* factor.
Fortunately, we need not pause long because we conclude that Mr. Quiroga's two
other statements—which undisputedly occurred prior to the show-up procedure—
provide ample and sufficient evidence for us to conclude that the third *Biggers* factor
supports a reliability determination.  Therefore, without definitively opining on the
propriety of considering it, we decline to rely on Mr. Quiroga's third statement to the
Postal Inspectors in our *Biggers* analysis.

"accurately described the robber as a white male, wearing a Ronald Reagan (or Nixon) type mask, wearing tan, beige, or khaki pants and a striped shirt, and carrying a sawed-off shot gun").

Mr. Gallegos does not dispute the accuracy of Mr. Quiroga's description; rather, he maintains that "other than the clothing, Mr. Quiroga's description is generic." Aplt.'s Opening Br. at 24. He reasons that Mr. Quiroga "did not see any physical features of his assailant" because, if he had actually seen the attacker's face, "he would not have focused his description on the yellow sweater and the other details would not have been so generic." *Id.* Therefore, Mr. Gallegos appears to contend that Mr. Quiroga's description was too generic to support a determination of reliability under the *Biggers* rubric.

This argument fails as a matter of logic and controlling precedent. It does not necessarily follow, as a matter of logic, that simply because Mr. Quiroga focused his description of the assailant to law enforcement—shortly after being attacked—on the assailant's clothing and other physical characteristics, that Mr. Quiroga did not also observe the assailant's facial features well enough to identify him at a later time. Moreover, our caselaw has not required witnesses to describe the defendant's facial features in order for us to deem their descriptions accurate for purposes of the *Biggers* analysis. *See Bredy*, 209 F.3d at 1196 (concluding that the witnesses' description of the robber—which focused on his race, clothing, and the weapon he wielded, was accurate even though "they could not see his face"). Here, Mr. Quiroga accurately described an assailant whose features corresponded in material respects to

Mr. Gallegos's build, ethnicity, hair, and clothing twice before participating in the show-up—more than satisfying this *Biggers* factor. *See Manson*, 432 U.S. at 115; *Brown*, 200 F.3d at 708.

4

As we acknowledged in *O'Neil*, and as social science research establishes, a witness's certainty concerning an eyewitness identification does not necessarily correlate to the accuracy of the identification—and thus does not necessarily indicate that his or her eyewitness-identification evidence is reliable. *See* 62 F.4th at 1289 n.13. The lack of a predictable correlation between witness confidence and accuracy renders this *Biggers* factor less influential in the overall analysis. Nevertheless, we cannot (and do not) negate the notion that an eyewitness's confidence in his or her identification *can*, in a given case, signal the accuracy of the identification—and thus bolster the reliability determination under *Biggers*. And that is true here.

Mr. Quiroga's confidence in his identification of his assailant as being Mr. Gallegos supports the reliability of the government's evidence. Explaining its ruling, the district court noted that Mr. Quiroga was "[a] hundred percent" certain that the man in custody was the same person who had attacked him. R., Vol. I, at 276, 331. Such confidence incontrovertibly supports a finding of reliability. *See Bredy*, 209 F.3d at 1197 (noting that multiple witnesses were "unequivocal" in their identification of the defendant); *Thody*, 978 F.2d at 629 (same).

On appeal, Mr. Gallegos highlights our caution in *O'Neil* about the correlation between witnesses' expressed certainty and the accuracy of their identifications, and

40

maintains that, "[b]ecause this factor does not help in determining reliability, it should be weighed neutrally." Aplt.'s Opening Br. at 25. However, *O'Neil*'s cautionary comment—which properly urges courts not to blithely correlate witness confidence in an identification with the accuracy of the identification—does not purport to excise from the *Biggers* analysis (even if a panel of our court could do so) the identification-confidence factor. Indeed, in *O'Neil* itself, we discerned nothing that would cause us to question the district court's reliance on that factor. *See* 62 F.4th at 1289 n.13. And, here too, "[w]e have no reason to question the district court's reliance . . . on [Mr. Quiroga's] own level of certainty in [his] identification[]," nor does Mr. Gallegos provide us with any such reason. *Id.*

Moreover, it is worth highlighting that Mr. Quiroga's hesitation in identifying Mr. Gallegos at the suppression hearing does not detract from the reliability of his confidence during the show-up identification. Recall that Mr. Quiroga was "[n]ot a hundred percent sure" at the hearing that Mr. Gallegos was his assailant because, sitting in the courtroom, Mr. Gallegos's appearance was "very different" than during the attack. R., Vol. I, at 296. Specifically, Mr. Quiroga noted that Mr. Gallegos's skin was "a little darker" and his hair was longer during the assault. *Id.* at 296–97.

This lack of certainty does not give us pause in our *Biggers* analysis. We are primarily concerned with Mr. Quiroga's confidence at the time of the show-up identification, *see O'Neil*, 62 F.4th at 1289, where Mr. Quiroga was unequivocal in identifying the assailant who was later determined to be Mr. Gallegos. And eyewitness uncertainty in court after a substantial period of time has passed and the

defendant's appearance has changed does not necessarily undercut the witness's initial confidence expressed at the time of the challenged identification. *Cf. United States v. Maldonado-Rivera*, 922 F.2d 934, 975–76 (2d Cir. 1990) (noting that the witness's identification would be reliable under the *Biggers* analysis because, in part, her inability to identify the defendant in court four years after last seeing him did not outweigh the other indicia of reliability, especially because his appearance had changed in that time); *United States v. Washam*, 468 F. App'x 568, 571 (6th Cir. 2012) (concluding that the witnesses' initial certainty was not undercut by the fact that "only one of the three witnesses who identified [the defendant] from the photo array also positively identified him at trial," because those two witnesses "testified they were confident about the identifications they made from the photo array at the time they made them" and more than three years had passed since the original identifications, during which time the defendant changed his hairstyle and facial hair).

**5**

The fifth and final *Biggers* factor—the amount of time between the crime and the identification—undisputedly bolsters the reliability of Mr. Quiroga's identification. The district court correctly found that the "length of time between the crime and the confrontation was short": Mr. Quiroga identified his assailant roughly one hour after the attack occurred. R., Vol. I, at 331. Our precedent makes clear that such a brief period of separation between the crime and the identification weighs in favor of a reliability determination, *see Bredy*, 209 F.3d at 1197 (finding that a thirty-

minute separation between the robbery and the identification supported admission); *Archuleta*, 864 F.2d at 712 (noting that a thirty-minute "interval is much shorter" than the days- and months-long intervals approved in *Biggers* and *Manson*), and Mr. Gallegos appropriately concedes that this factor cuts against suppression.

### D

We must view the *Biggers* factors in the totality along with any other relevant evidence. Though we recognize that the first two *Biggers* factors do not strongly weigh in favor of the government on the reliability issue, they nevertheless do so. And the remaining three *Biggers* factors strongly weigh in the government's favor. Viewing the *Biggers* factors and the facts before us as a whole, we conclude that there was not "a very substantial likelihood of irreparable misidentification," *Manson*, 432 U.S. at 116 (quoting *Simmons*, 390 U.S. at 384), associated with Mr. Quiroga's eyewitness-identification evidence.

### IV

We now turn to Mr. Gallegos's challenge to the district court's admission of the evidence of his post-attack flight. As we have discussed, the district court admitted this evidence by ruling on three different motions: (1) the government's opposed motion to admit evidence of Mr. Gallegos's flight, (2) the government's opposed motion to admit the footage from Sergeant Whitten's lapel camera, and (3) Mr. Gallegos's opposed motion to exclude testimony regarding the circumstances of his arrest.

The district court ruled in favor of the government on all three motions, finding that the evidence of Mr. Gallegos's flight went to "context, res gestae, state of mind and identification," that excerpts of Sergeant Whitten's body-camera footage demonstrated "res gestae . . . [and] context," and that the circumstances of Mr. Gallegos's arrest were indicative of "context, res gestae, state of mind, and identification." R., Vol. III, at 236–37, 242, 244. It also found that the contested evidence was relevant and not unduly prejudicial.

Mr. Gallegos argues that the district court abused its discretion in each of these rulings. On appeal, he does not focus on any single decision, but rather attacks them all in the aggregate by thematically arguing that evidence of his flight (1) was not indicative of consciousness of guilt, (2) was not intrinsic to the charged offense, and (3) was unduly prejudicial.[15] His arguments fail across the board.

**A**

**1**

"Traditionally flight has been viewed as an admission by conduct which expresses consciousness of guilt." *United States v. Martinez*, 681 F.2d 1248, 1256 (10th Cir. 1982) (per curiam); *accord* 2 Mosteller, *supra*, § 263 ("Many acts of a

---

[15]    Mr. Gallegos appears to target each of the district court's orders as part of an overarching challenge against the admission of evidence of his post-assault flight and the circumstances of his arrest. His conceptual approach therefore focuses on the separate underpinnings of the district court's rulings, rather than each ruling in isolation—which makes some intuitive sense, given that the district court provided similar rationales for deciding the separate motions. Therefore, our analysis largely corresponds with this thematic approach.

defendant after the crime seeking escape are received as admissions by conduct, constituting circumstantial evidence of consciousness of guilt. . . .  In this class [is] flight from the scene . . . .").  Therefore, "flight evidence carries with it a strong presumption of admissibility." *Martinez*, 681 F.2d at 1256.  But "[d]ue to the fact that flight evidence is sometimes ambiguous, courts at times assert that such evidence is of questionable probative value unless the inferences of guilt that accompany the particular facts associated with it are strong." *Id.* at 1257.  That said, so long as guilt is *a* "permissible" inference from the flight evidence, the evidence is admissible, even if the same conduct gives rise to other permissible inferences as well. *United States v. Lepanto*, 817 F.2d 1463, 1467 (10th Cir. 1987); *see also United States v. Akers*, 215 F.3d 1089, 1103 (10th Cir. 2000) ("This court has also rejected the notion that, in order for evidence of flight to be admissible in a criminal prosecution, there can be only one possible explanation for the defendant's flight: guilt of the crime or crimes charged.").  A district court's decision to admit evidence of flight "will not be reversed absent an abuse of discretion." *Lepanto*, 817 F.2d at 1467.

## 2

A district court may determine that certain, non-charged acts committed by the defendant are intrinsic to the charged offense itself—and therefore admissible at trial. *See United States v. Piette*, 45 F.4th 1142, 1155 (10th Cir. 2022).  As relevant here, "[i]ntrinsic other acts evidence encompasses conduct 'inextricably intertwined with the charged crime such that a witness's testimony would have been confusing and

incomplete without mention of the prior act.'" *Id.* (quoting *United States v. Ford*, 613 F.3d 1263, 1267 (10th Cir. 2010)). "This is known as res gestae" evidence. *Id.*

"Generally speaking, '[i]ntrinsic evidence is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury.'" *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009) (alteration in original) (quoting Thomas M. DiBiagio, *Intrinsic and Extrinsic Evidence in Federal Criminal Trials: Is the Admission of Collateral Other-Crimes Evidence Disconnected to the Fundamental Right to a Fair Trial*, 47 SYRACUSE L. REV. 1229, 1231 (1997)). Intrinsic or res gestae evidence is "not subject" to Federal Rule of Evidence 404(b)'s prohibition on prior acts evidence. *Piette*, 45 F.4th at 1155. We review a district court's decision to admit evidence as res gestae or intrinsic evidence for an abuse of discretion. *See id.* at 1157.

**3**

Federal Rule of Evidence 401 directs that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." FED. R. EVID. 401. Rule 403 imposes a restriction on that standard, however: courts may exclude evidence where, in relevant part, the danger of "unfair prejudice" "substantially outweigh[s]" its probative value. FED. R. EVID. 403. "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* advisory comment to 1972 amendment; *accord United States v. Silva*, 889 F.3d 704, 712 (10th Cir. 2018). "Rule 403 does not

protect a party from all prejudice, only unfair prejudice." *United States v. Smith*, 534 F.3d 1211, 1218–19 (10th Cir. 2008) (quoting *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1274 (10th Cir. 2000)); *see United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001) ("[W]e note that unfair prejudice does more than damage the Defendant's position at trial. Indeed, relevant evidence of a crime which the government must introduce to prove its case is by its nature detrimental to a defendant who asserts that he is not guilty of the charged offense.").

"In performing the [Rule] 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1139 (10th Cir. 2006) (quoting *Deters*, 202 F.3d at 1274). "[E]xclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." *Id.* (alteration in original) (quoting *Tan*, 254 F.3d at 1211). "The district court is clearly in a superior position to perform this analysis, and thus is accorded broad discretion in making such decisions." *Eisenhour v. County*, 897 F.3d 1272, 1277 (10th Cir. 2018) (quoting *Deters*, 202 F.3d at 1274).

## B

We conclude that none of Mr. Gallegos's challenges to the district court's admission of the evidence of his flight are successful. The district court was well within its discretion to admit evidence of Mr. Gallegos's flight under both theories proffered by the government: that is, the evidence was indicative of consciousness of

guilt and was intrinsic to the charged offense.  And the evidence was not unduly prejudicial under Rule 403.

**1**

The district court ruled that evidence of Mr. Gallegos's flight went to his "state of mind" and allowed it, in part, on those grounds.  R., Vol. III, at 236–37, 244.  Mr. Gallegos contends that this decision was an abuse of its discretion because, as a "homeless individual" who struggled with addiction and faced active warrants for his arrest, he had legitimate reasons to flee from the police separate from any encounter with Mr. Quiroga.  Aplt.'s Opening Br. at 34.  Further, he contends that "[e]vidence from which a conclusion can be derived only by speculation among equally plausible alternatives is not probative of that conclusion"—meaning that any evidence of his flight was not probative of guilt.  *Id.* at 36.

These arguments do not carry the day.  First, even accepting *arguendo* that there was an equally plausible alternative reason than guilt for Mr. Gallegos's flight, that still does not render this evidence inadmissible.  Flight evidence may be admitted so long as guilt of the charged offense is *a* permissible inference from the conduct, even if it is not the *only* one.  *See Lepanto*, 817 F.2d at 1467.  The inferences of guilt accompanying the fact of flight here are more than sufficient to affirm the district court's admission of the flight evidence.  Mr. Gallegos fled from the police shortly after allegedly menacing a postal officer with a knife.  During the flight, he discarded his distinctive yellow sweater and the knife that he had allegedly used to assault Mr. Quiroga.  Mr. Gallegos's conduct generates more than a fair inference that he

48

wanted to abandon his most notable item of clothing—the yellow sweater, which Sergeant Whitten observed was an unusual choice on a hot, sunny day—as well as the weapon that Mr. Quiroga described the assailant as brandishing during the assault.

Second, Mr. Gallegos attempts to distinguish *Martinez* and *Lepanto* by arguing that the defendants in both cases knew that they were wanted by law enforcement authorities before they fled—whereas he had no such knowledge. This position is unavailing. Mr. Gallegos presents no case indicating that we require a showing that a defendant knew of law enforcement's pursuit in order to admit flight evidence. And, in fact, a panel of this court has rejected a very similar argument to the one that Mr. Gallegos advances here. *See United States v. Brown*, 190 F. App'x 704, 710 (10th Cir. 2006) ("This Circuit . . . has never required evidence of a direct causal link between an accused's knowledge of an indictment or warrant and the accused's flight."). More broadly, Mr. Gallegos ignores the principles that we announced in *Martinez* and *Lepanto*: flight evidence is presumptively admissible as consciousness of guilt, provided that guilt is one possible, probative inference. *See* 681 F.2d at 1256; 817 F.2d at 1467; *see also Akers*, 215 F.3d at 1103. With that touchstone in mind, the district court was well within its discretion to admit testimony of Mr. Gallegos's flight as evidence of his state of mind—that is, evidence of his guilty state of mind.

**2**

In any event, the district court properly admitted the flight evidence as res gestae or intrinsic evidence.  Mr. Gallegos challenges the district court's ruling because, according to him, the government could have presented sufficient evidence to prove the elements of the charged offense without introducing evidence of his flight.  He contends that the district court should have curtailed the government's evidence so that Sergeant Whitten would have testified to only the fact that he arrested Mr. Gallegos after seeing a suspect matching the description of the assailant—not also to the fact that the arrest took place after a chase.  Similarly, he maintains that investigators could have testified simply that they found a knife in the shed where Mr. Gallegos was found, without explaining why they responded to that particular location.

Mr. Gallegos, however, does not cite any authority compelling us to conclude that the district court abused its discretion in reaching its decision.  This absence sounds the death knell to this challenge, especially under the deferential abuse of discretion standard.  Moreover, the government argues convincingly that the "sanitized testimony" that Mr. Gallegos proposes "would have been incomplete and confusing" for the jury.  Aplee.'s Resp. Br. at 30.  It would have been entirely reasonable for the district court to determine that excising evidence regarding the chase would have left the jury confused as to why Mr. Gallegos was arrested as the suspect when he was not wearing the yellow sweater that Mr. Quiroga described, or why Mr. Gallegos was arrested in the backyard of a stranger's home.  The court did

not abuse its discretion in finding that the narrative of the chase was necessary context without which the relevant testimony "would have been confusing and incomplete." *Piette*, 45 F.4th at 1155 (quoting *Ford*, 613 F.3d at 1267).

Further, we have found that flight evidence is admissible as res gestae or intrinsic evidence when it explains "the circumstances of [the defendant's] arrest" for the charged offense. *Ford*, 613 F.3d at 1268. In *Ford*, we affirmed the district court's admission of evidence of the defendant's escape from prison as res gestae because, in relevant part, it explained "his need for [the] weapons" which he was accused of possessing, and his reason for fleeing police at the scene of his arrest. *Id.* As in *Ford*, the evidence of Mr. Gallegos's flight provided crucial context for the jury and explained the circumstances of his arrest. As such, Mr. Gallegos has failed to show that the district court abused its discretion in admitting this evidence as res gestae or intrinsic evidence.

### 3

We also reject Mr. Gallegos's final argument: that evidence of his flight was irrelevant and unduly prejudicial, requiring the district court to bar its admission pursuant to Rule 403. In brief, he maintains that the evidence of his flight— specifically, his trespass into the area of the house and his approach of the house's backdoor, which caused the police to fire a sponge-round at him—"paint[ed] [him] as a terrifying criminal ready to violate anyone's space" and "assault a stranger," and was thus impermissibly prejudicial. Aplt.'s Opening Br. at 38.

Mr. Gallegos cites no controlling authority to support this position, however. Instead, he merely cites the standard for exclusion under Rule 403 and then maintains that the evidence here satisfies that test.  This conclusory argument is unavailing.  As discussed above, the flight evidence was probative.  Therefore, excluding it would be an "extraordinary remedy" and, beyond his conclusory arguments, Mr. Gallegos gives us no reason to conclude that the district court abused its discretion in declining to take such an extraordinary step.  *World Wide*, 450 F.3d at 1139 (quoting *Tan*, 254 F.3d at 1211).  Even assuming *arguendo* that this evidence prejudiced Mr. Gallegos to some extent, it would not have been unreasonable for the district court to conclude that it was not unfair prejudice.  *See, e.g.*, *Smith*, 534 F.3d at 1218–19.  Moreover, the district court could have reasonably concluded in any event that the evidence's probative value was not *substantially* outweighed by the danger of unfair prejudice.

## V

For the foregoing reasons, we **AFFIRM** Mr. Gallegos's conviction for assaulting a federal officer with a dangerous weapon.